Edwin C. Day, Trustee, Appellee, v. Luna Park Company and James O'Leary, Appellants.

### Gen. No. 16,480.

1. BANKRUPTCY—*evidence not showing value of asset.* In a proceeding by a trustee in bankruptcy to recover the value of a bar concession in an amusement park claimed to have been wrongfully forfeited, an offer of a creditor to buy the concession for a certain amount is not entitled to great weight as evidence of value, as the return from the investment to the witness would include a refund to him of that proportion of it which his claim bore to all the liabilities.

2. CONSPIRACY—*evidence insufficient to show conspiracy to deprive concessionaire of property.* An amusement park by contract

granted a license to a concessionaire to conduct a bar. The contract provided that the park's percentage of the receipts should be paid daily and had other stringent provisions, noncompliance with which would work a forfeiture. The principal stockholder, the substantial owner, permitted settlement from time to time to be deferred for many days. He showed an eagerness to bring the relations to an end and upon a check from the concessionaire being returned because of insufficient funds, he declared a forfeiture of the license. *Held,* the evidence was insufficient to show a conspiracy to deprive the concessionaire of his property.

3. Contracts—*when forfeiture of license may be declared.* Where a contract granting a license to a person to conduct a bar in an amusement park provides that the park's percentage of the receipts shall be paid daily and on a default a forfeiture may be declared, on a return of a check given by the concessionaire because of insufficient funds, a forfeiture of the license may be declared even though the park company from time to time permitted settlement to be deferred for many days.

4. Bankruptcy—*when concession license does not pass to trustee.* Where a contract by an amusement park company granting a license to a concessionaire to conduct a bar provides that it must not be assigned or transferred without the consent of the park company, on the concessionaire becoming bankrupt the license does not pass to his trustee in bankruptcy.

5. Equity—*when remedy is at law.* Where a bill by a trustee in bankruptcy of a person having a license by contract to conduct a concession in an amusement park alleges that by a conspiracy between the park and the principal stockholder the license was forfeited and that property was withheld from the concessionaire, and the decree ordered the forfeiture to be set aside and awarded a sum of money for the value of the concession, the theory of the bill and the decree is fallacious, since the remedy is at law for a breach of the contract.

Appeal from the Superior Court of Cook county; the Hon. Arthur H. Chetlain, Judge, presiding. Heard in this court at the March term, 1910. Reversed with directions. Opinion filed November 18, 1912. *Certiorari* denied by Supreme Court (making opinion final).

**Statement by the Court.** One Louis Sbarbaro entered into a "concession contract" with The Luna Park Co., a corporation running an amusement park, September 24, 1906. By it the Company granted Sbarbaro permission to occupy for five years a parcel of land (85 by 75 feet) on the main promenade of the amusement park; Sbarbaro on his part to erect a building

on it to cost not less than $4,000, to furnish all necessary tables and chairs for adequate service about Company's grounds, and suitable equipment for service in the building.

Numerous other provisions binding on the respective parties were included in the contract, important among them being the following:

The "concession" being for "wines and liquors," the "concessionaire" agrees that "the price for draught beer sold by him thereunder shall not exceed five cents per glass." Concessionaire further agrees to furnish and sell cigars. "All improvements are to revert to the Company at the termination of the contract under any of the provisions thereof." "Concessionaire further agrees that the concession thereby granted to him shall be operated by him in connection with the concession contract number 29, and that all waiters employed thereunder shall serve both food and liquor." The concessionaire agrees to pay to the Company "as compensation for this concession license and the use of the premises, etc., thirty per centum of the gross receipts from all sources derived from the operation or maintenance of this concession and every part thereof, etc., payable as hereinafter provided." "The Company shall have the right to appoint * * * a cashier to carry out the provisions of this contract for its protection and the salary * * * which shall not exceed two dollars a day * * * shall be paid out of the concessionaire's share of the gross receipts * * * weekly." "The concessionaire covenants to use only electric lights, * * * that the current for said lights shall be furnished by said Company, and that he shall pay therefor" at certain rates. The payments are to be made weekly.

"It is expressly understood and agreed that said part, parcel, building, structure or space in said Luna Park is not leased to the concessionaire; that he is a licensee and not a lessee thereof; that his right to occupy the same and to operate the concession hereby granted shall continue only so long as each and all the undertakings, provisions, covenants, agreements, stipu-

lations and conditions herein contained on his part are strictly and promptly complied with. In case he shall default in the strict and prompt performance thereof, or of any of them, the Company may immediately or at any time after such default close up and take possession of said part, parcel or space in Luna Park and of any and all buildings and structures erected thereon, except as hereinafter provided, and the said concession and license to the concessionaire shall thereby be forfeited, together with all privileges to occupy or use any part of said part, parcel, building or structure or space in said Luna Park.''

''The concessionaire shall have no right, authority or power to sell, mortgage, assign or parcel out this contract or the concession hereby granted to him, nor any interest therein, nor any right, power or authority to allow or permit any other person or party to have any interest in or use any part of the premises, building, space or spaces covered by this concession for any purpose whatsoever, without the written consent of the Company, it being the purpose and spirit of this contract to grant said concession and privilege solely to concessionaire and neither directly or indirectly to any other person or party.''

''The concessionaire covenants and agrees that said Company shall have the right, through its officers or agents appointed for that purpose, to receive directly from the ticket sellers, cashiers, cash registers or other persons and appliances receiving money in the operation of said concession, all moneys received from any and all sources covered by this agreement, and said moneys shall be taken in charge by the Accounting Department of said Company, and the said Company shall within seven days after the receipt of such moneys return to said concessionaire his share or proportion thereof, less any sum or sums of money which may then be due to said Company from said concessionaire under any provisions of this contract or otherwise.''

''Should the concessionaire be permitted to receive the moneys from any or all sources of income mentioned in this contract, the concessionaire shall make full statements, settlements and payments of percent-

ages due to said Company under the provisions of this contract every day at such place and time of day as said Company may designate.''

''The said concessionaire covenants and agrees to supply and have ready for sale each and every vendible article included in this concession in sufficient quantity to satisfy the demands of the patrons of Luna Park at all times on and after the day of the opening of Luna Park until its close at the end of each season, and that he will operate all the features of such concession at such hours of the day and night as said Luna Park shall be open to the public unless prevented from so doing as herein provided.''

''It is expressly understood and agreed that the waiver by said Company or its officers or agents of any cause of forfeiture under this contract shall not operate as a waiver of any other cause of forfeiture or affect any other right of said Company under this contract.''

''The concessionaire shall procure at his own cost and expense all necessary licenses and official permits necessary for the purpose of carrying out the provisions of this contract.''

''All notices and orders herein provided to be given to the concessionaire may be served by mailing the same to him at his last known place of residence or business outside of Luna Park, or by delivering a copy thereof to him in person or by leaving it, addressed to him, at his place of business in Luna Park with any person then in charge of the same.''

''The concessionaire covenants and agrees that should the carrying out of the said purposes of this concession in full be stopped by legal proceedings, criminal or civil, brought against the concessionaire or against any of his employes, then said Company may by written notice to the concessionaire cancel and terminate this concession and contract and thereupon all his rights and privileges herein granted shall cease.''

''The concessionaire covenants and agrees that if during any period of three successive weeks between the first day of June and the first day of September

in any season, said Company's average weekly percentages of the gross receipts from all sources in the operation of this concession shall be less than one hundred and fifty dollars under the terms of this contract, then the Company may, by a notice in writing to the concessionaire, cancel and terminate this contract and concession, and thereupon all the rights and privileges herein granted to him shall cease and end, and the Company may summarily take possession of and close the premises, buildings, structures, space and spaces included in this concession, and remove therefrom all the property and effects of the concessionaire.''

''The concessionaire shall within two weeks after the termination of this contract remove from Luna Park all his personal property, goods and effects, and on his failure so to do, said Company by its officers and agents may cause such removal to be made and said property, goods and effects to be stored at the cost and expense of the concessionaire, and the said Company shall have a lien thereon for the cost and expenses of such removal and storage of such property, goods and effects.''

Another contract similar, except that the concession was for a restaurant, that the location for the buildings was at the option of the Company, that the compensation to be paid the Company was to be a flat payment of twenty-five dollars a week during the season, and that the duration of the concession was three years instead of five, was on the same day entered into between Sbarbaro and the Luna Park Co. This restaurant ''concession'' contained the clause: ''Concessionaire further agrees that the concession hereby granted to him shall be operated by him in connection with the concession granted in Luna Park Concession contract number 31'' (the bar concession heretofore set forth) ''and that all waiters employed thereunder shall serve both food and liquors.''

Before the Park opened, however, an arrangement was made between the Luna Park Company and Sbarbaro, by which Sbarbaro was allowed and induced by

the Company to transfer the restaurant concession to John Golombiewski, who agreed to pay Sbarbaro $40 a week for it, thus netting an income to Sbarbaro of $15 weekly from it over the rental to be paid by him. To operate the bar concession Sbarbaro erected a building on the premises of the Company and installed therein various fixtures and other property necessary and incident to the conduct of the business.  He began business at Luna Park at the opening of the season of 1907, and during the summer of that year he testified in the case at bar that the gross receipts were, he thought, from ten to twelve thousand dollars, which would be at an average of from $700 to $850 weekly. The season is about fourteen weeks, running from Decoration or Memorial Day, May 30th, to Labor Day, the first Monday in September, inclusive.

Also from the  beginning of the season in 1908 to August 24, 1908, a little more than twelve weeks, Sbarbaro operated the concession.  The gross receipts for this time were $6,446.70, thus averaging a little over $500 a week, of which 30 per cent. would be at least $166.66 weekly.

But the evidence shows that for Monday, Tuesday, Wednesday and Thursday, August 17th to August 20th, inclusive, the gross receipts must have been but $80.80; Friday, August 21st, they were $31.50; Saturday, August 22nd, $35.26; and Sunday (always the most profitable day of the week for the business involved), August 23rd, $71.80; thus aggregating for the full week from August 17th to August 23rd, inclusive, $219.36, of which the 30 per cent. to go to the Luna Park Company amounted to $65.81.

The answer in the case at bar contains the assertion that "the average weekly percentage of the gross receipts from all sources in the operation of three consecutive weeks next immediately preceding the 22nd day of August, 1908, were less than $150 per week;" but no proof of this statement appears in the evidence.

For some reason, however, according to the testimony of Sbarbaro, James O'Leary who, on August 1, 1908, had purchased all or substantially all the stock of the Luna Park Company and had become its President, did at some time shortly preceding Monday, August 24, 1908, warn Sbarbaro of financial trouble pending over him (Sbarbaro) and urge him on that account to accept a proposition which was then made to him by O'Leary. It is a little difficult (perhaps through clerical errors in the stenographer's report of the testimony) to determine precisely the date of the conversation we refer to, but it was at least a day before the action looking toward forfeiture taken by O'Leary, and before the dishonor of the check which was its immediate occasion. From the statement of Sbarbaro as to the sending by O'Leary of an employee as a messenger to him more than once, it would seem as though the warning was earlier than Sunday, August 23rd. But it was at least by that day. Mr. Sbarbaro testified:

"Mr. O'Leary came to me and says to me that I was going to be closed up by the Sheriff on a Monday morning, and he told me that I should sell out to him; that he would pay my help and pay for my stock, that the brewers were going to screw me, and he sent Mr. Suggs over two or three times."

Sbarbaro further testified that after he had that conversation with O'Leary "on a Sunday afternoon," he "went on a Sunday evening, August 23rd, and called a lawyer to his house and asked his advice about filing a petition in bankruptcy, and that the lawyer told him to wait, and was instructed by him (Sbarbaro) to prepare the papers to file in case he was closed up "on a Monday."

On Friday, August 21st, too late for deposit on that day in the usual course of the Park Co's business, Sbarbaro had given the cashier of the Company a check on the "Woodlawn Trust and Savings Bank" for $24.24, being the 30 per cent. called for by the con-

cession contract on the gross receipts from August 17th to August 20th, inclusive.

There were at this time bills for lights and cashier's wages provided for by the concession contract, amounting at least to $46.25, which were due from Sbarbaro to the Company, and were unpaid. According to the testimony for the complainant they were presented to Sbarbaro at the time of his execution of this check, and he said he could not pay these bills, but would pay his percentage bills with the check in question, and as he expected to have a good day Sunday over the bar he would come in Monday and pay the others.

Sbarbaro was at the Park on the afternoon or evening of Sunday, the 23rd, for the last time. He left two or three hours before the closing time and never returned. Monday, the 24th, the check which he had given on Friday, the 21st, and which had been deposited after clearing house hours on Saturday, the 22nd, in the Drovers Deposit National Bank, was returned by the Woodlawn Trust & Savings Bank to the Drovers Bank and by the Drovers Bank to O'Leary or the Luna Park Company, unpaid, there not being sufficient funds to meet it. Thereupon O'Leary had his employee Suggs find Sbarbaro at a saloon he had on South Park avenue, and serve on him the following notice:

"Luna Park Company, 521 Halsted Street,
James O'Leary General Manager,
Chicago, Illinois, August 24, 1908.
Mr. Louis Sbarbaro, Chicago: This is to notify you that you have violated your concession contract for the bar and restaurant at Luna Park, and I now take possession of the same.
Yours truly,
James O'Leary."

Immediately thereafter, on the same afternoon, O'Leary for the Company took possession of all the property appertaining to the bar business at the Park, and ran it. The receipts from the business thus con-

ducted for the 15 days from August 24th to September 7th, inclusive, September 7th being a holiday (Labor Day) and presumably one of the most profitable days of the season of which it was the close, were $776.10, an average of $362.18 for a week, of which 30 per cent. would not amount to $110.

The actual business of the restaurant concession being in the hands of Golombiewski, was not disturbed. Golombiewski testified that in 1907 he made a net profit on the restaurant concession of about $2,500, but that in 1908 he made nothing whatever. Before the season began in 1909 he sold to O'Leary for $350 his interest in the concession, including various fixtures, appliances and chattels used in the business, the value of which he estimated at $200. He testified: ''Mr. O'Leary said the best way is to get together and I will buy you out and have no more trouble. On that I made the suggestion that I would sell out to Mr. O'Leary.''

On the service of the notice above mentioned on him and the seizure of the property pertaining to the bar concession, Sbarbaro on the same afternoon instructed his attorney to file a voluntary petition in bankruptcy for him. Such a petition was filed on Wednesday, August 26th. The schedules attached showed liabilities of $15,000 and assets of $15,000, according to oral testimony concerning them, received at the trial of the case at bar. What, if anything, they represented concerning the concession and property involved here, does not appear, however. Sbarbaro was adjudged a bankrupt on August 26th and the complainant in the cause at bar, Edwin C. Day, was appointed receiver of the bankrupt's estate on August 27th. He was elected trustee of the estate on September 28, 1908. Both as receiver and trustee he made demands on the Luna Park Company and O'Leary to consent to the setting aside of the forfeiture of the two concession contracts and to turn over to the estate all the property seized by the Luna Park Company. The Luna

Park Company and O'Leary refused to set aside the forfeiture and claimed that it terminated all rights of Sbarbaro and his bankrupt estate to the concession contract and the improvements erected by Sbarbaro on the premises of the Luna Park Company. It made no claim on the personal property which had belonged to Sbarbaro, but demanded that it be taken away by the trustee. The trustee refused to take back the personal property segregated from the bar concession, but claimed the money value thereof. Some proceedings seeking the same remedy asked by the bill in this case seem to have been taken in the Federal Court in the bankruptcy case, with what result does not appear; but on May 28, 1909, the trustee, Day, filed his bill in the Superior Court of Cook County, setting up the facts before herein stated, but alleging in addition that shortly after O'Leary purchased the capital stock of the Luna Park Company he and the company entered into a conspiracy for the purpose of fraudulently depriving Sbarbaro of his property and his concession contract rights and converting the same to their own benefit, and that in pursuance of said conspiracy the defendant permitted Sbarbaro to receive the money under the concession contracts and failed to require him to make statements or settlements every day, but allowed him to remain in arrears sometimes ten days, and induced him to think that the time limit about settlements was not of the essence of the contract and would not be insisted on; that because of this Sbarbaro, who believed when he gave the check for $24.24, which was dishonored, that there were sufficient funds to meet it, made no special investigation to ascertain the facts, but assumed that if the bank should refuse the check he would be given a reasonable opportunity to make it good, and that the company would not undertake to forfeit his concessions.

The bill further alleges that the asserted forfeiture, the seizure of the property and all the subsequent proceedings of O'Leary and the Luna Park Company in

connection therewith were in pursuance of the conspiracy charged.

The bill then proceeds to set out the ordinances of the City of Chicago relating to dramshop licenses, and alleges that the Luna Park Company secured a license from the City of Chicago covering the premises of Luna Park for the year following May 1, 1909, but that the complainant (Day, trustee) did not, and was unable, by reason of the facts set forth in the bill, to have any assurance that if he procured such a license he could obtain possession of the building formerly occupied by Sbarbaro.

The bill prays that the forfeiture by the defendants of the concession contracts be declared of no effect; that the defendants be compelled to account to the complainant for the business done and receipts taken from August 24, 1908, to September 7, 1908, and be decreed to pay to the complainant the reasonable cash value of the property seized under the alleged forfeiture, "together with the reasonable cash value of said concession contracts" (bar and restaurant) "sought to be forfeited."

In the alternative the bill prays that if this decree for the reasonable cash value of the concession contracts, and the property seized and converted by the defendants cannot be given, the defendants be held and declared to have acted as the agents of the complainant in securing the saloon license for 1909, and that said license is the property of the complainant; and that it be declared that said concession contracts may be sold by the complainant in due administration of said bankrupt estate, and that the complainant has power to confer good title by proceedings in bankruptcy. Injunctions against removing the property or proceeding further to attempt to forfeit the rights or property of Sbabaro are also prayed, both perpetually and *pendente lite*.

The answer filed by the defendants *inter alia* denies that the concession contracts were of great value,

and asserts that they were of no value either to Sbarbaro or the complainant, and also denies that the defendants entered into any conspiracy to wrongfully deprive Sbarbaro of any property or rights or to induce any false conviction in Sbarbaro's mind about their enforcement of a forfeiture.

It sets up, as before noted, that the average weekly percentages of the gross receipts from all sources for three consecutive weeks next preceding August 22, 1908, were less than $150 a week, and also that Sbarbaro was on August 24, 1908, in default in payments for electric light to the amount of $13.25, and in payment of cashier's wages to the amount of $33, and in payments of percentage bills to the amount of $65.81, and was in default in relation to having on sale for some time before the forfeiture the goods of the quality specified in the concession contracts. It denies that the company undertook to forfeit Sbarbaro's rights under the contracts and seize the personal property and building by reason alone of the non-payment of the check for $24.24, but asserts that Sbarbaro having violated the conditions of the contracts, the Company rightfully took possession of the building and property by virtue of the provisions thereof and forfeited said contract.

The answer also asserts the willingness of the Luna Park Company to account for any wines and liquors theretofore owned by Sbarbaro and sold by it between August 24th and September 7th, 1908, and asserts that all the remainder of the personal property owned by Sbarbaro is stored in a building at Luna Park subject to the disposal of the complainant.

The cause coming to a hearing on bill, answer, replication, proofs and argument, the chancellor in the Superior Court entered a decree in favor of the complainant, finding all the material allegations of the bill of complaint true, including the existence of the conspiracy charged between O'Leary and the Luna Park Company to deprive Sbarbaro of his property and his concession contract rights. The decree found the bar

concession contract to have been on August 23, 1908, and for eight months thereafter of the value of $5,000, and the restaurant concession of the value of $245, and the value of the personal property seized by the defendants at the time of the forfeiture to be $1,495.90. It also found that the alleged forfeiture of the two concession contracts by the defendants was null and void and that the seizure by said defendants of the rights, privileges and property of Sbarbaro was "a wrongful conversion of the rights, privileges and property thus seized by the said defendants to their own use."

It ordered, first, that the forfeiture of the two concession contracts be set aside and declared of no effect; and, second, that the defendants pay to the complainant the sum of $6,796.01, with interest from the date of the decree and costs of suit. This sum was ostensibly reached by deducting from the sum of $5,000 $245 and $1,495.90 found to be the value of the property converted, the items of money due from Sbarbaro to the Park Company, $13.25 for electric lights, $33 for cashier's wages, $25 for payment for the restaurant concession for the week ending August 28, 1908, $41.57 for percentages due under the bar concession for August 21, 22 and 23, 1908, and $24.24 for the repudiated check of August 21, 1908. The discrepancy of $192.17 is attributed by the complainant in his argument here to an allowance for interest from the date of the alleged conversion to that of the entry of the decree. Nothing is said of this in the decree, however.

The defendants appealed to this court and assign as errors that the court admitted improper and refused proper evidence, that the findings and decree are against the law and the evidence, and specifically that "the decree is excessive in amount," that the court erred in finding that the said concession contracts, or either of them were of any value whatsoever to the trustee of the estate of Louis Sbarbaro, bankrupt; that "the court erred in finding that the concession con-

tracts could be transferred to the trustee in bankruptcy without the consent of the defendants;'' and ''the court erred in finding that any rights under the concession contracts, or either of them, passed from Sbarbaro to the trustee in bankruptcy under the voluntary petition in bankruptcy of said Sbarbaro,'' and in finding that the trustee acquired any interest in said contracts.

PATTISON & SHAW and DOUGLAS I. GREGG, for appellants.

HELMER, MOULTON & WHITMAN, for appellee.

MR. JUSTICE BROWN delivered the opinion of the court.

Examination of the record in this case has convinced us that whatever were our views of the law on the material questions involved, we could not affirm the decree appealed from. Even assuming, as contended by the complainant, first, that the rights of Sbarbaro under the ''concession contracts'' were never validly forfeited or terminated; secondly, that these rights were property interests which passed as integral matters to his assignee in bankruptcy, and which the ''seizure'' and attempted forfeiture had not transformed into mere claims for the breach of contracts; and, thirdly, that a Court of Equity had power, under this condition of things, to substitute a money decree on the theory of a tortious conversion, for the relief theoretically more logical and obvious, of merely setting aside the forfeiture and reinstating Sbarbaro's assignee in the possession of the property and business involved in the concessions; and requiring an account for the time it was usurped by others—we should still be obliged to reverse that money decree on the ground that its amount was against the weight of all the competent, material and cogent evidence to be found in the record thereon. The ultimate decision we have reached on the case as a whole, however, renders immaterial

the matter of the values which the court below placed
on the various interests and parcels of property. which
it considered were wrongfully withheld from the com-
plainant.

We shall not stop, therefore, to discuss any of the
details of the values attributed to the various chattels
which made up a part of the sum decreed to be paid
or to question the computation, except as to the value
of the bar "concession contract." But we do think
it necessary to say that we cannot find in the evidence
taken together justification for the appraisement of
$5,000 placed on that. In so saying we have fully in
mind the testimony of the men familiar with amuse-
ment park management, who were introduced as ex-
perts and swore that for an unexpired term of three
years the concession was worth certain large sums.
The testimony, however, to this effect was on a wholly
speculative basis, and a careful consideration of the
facts and figures of what actually had to be expended
by the concessionaire to keep the bar business and
concession alive, shows to our satisfaction that no such
estimate as was put upon them by three experts should
be the basis of any judgment.

While it is true that a bad season may be succeeded
by a good one and prosperity follow depression, it
cannot be wholly ignored in this case that whatever
the success of Sbarbaro's business during the first year
of the concession, there was evidently a severe
"slump" in the second, and that the concluding portion
of the season seems to show a peculiarly bad condition.
We shall not attempt to analyze in this opinion, as we
have done in our study of the record, the facts and
figures on which our conclusion is based. Such an
analysis is needless here, as we are of the opinion, as
hereinafter set forth, that the assumptions of law above
stated, on which alone could be predicated any right
of the complainant to recover in this cause, cannot be
properly made. We will stop, therefore, on this mat-
ter of the value of the "bar concession" only to note

that the offer of Mr. Merle to purchase the concession and the personal property involved in it for $3,500, and furnish a man to run the business, might seem to indicate, as nearly as any of the evidence offered by the complainant, that the concession had a considerable value. It must be remembered, however, that the witness was one of the creditors of the bankrupt estate whose return from the investment would include the refund to him of that proportion of it which his claim bore to all the liabilities of Sbarbaro.

But returning to the propositions of law maintained by the complainant and adopted by the court in framing the decree, we must express our disagreement with them.

There is, in our opinion, no evidence of a conspiracy in this case against Sbarbaro or his interests. The evidence seems to us to show an extremely stringent and drastic contract, into which Sbarbaro voluntarily and too sanguinely entered, a declining business, fears both on his part and on that of O'Leary that he would be pressed by other creditors to the wall, insufficient capital or credit on Sbarbaro's part to stand any continued depression in his business, and a willingness, perhaps even an eagerness on the part of O'Leary, to bring the relations between them to an end, the opportunity given O'Leary to do so by a plain violation by Sbarbaro of the covenants and conditions of the contract, the immediate acceptance of the opportunity by O'Leary, the rigorous but valid enforcement of forfeiture allowed by the terms of the contract, and the immediate and complete abandonment of any personal attempt by Sbarbaro to fulfill the obligations of said contract or to redeem from the forfeiture, and his voluntary rush into a bankruptcy already contemplated.

All this furnishes to our mind no reason for holding there was a "conspiracy," nor that the previous indulgence shown Sbarbaro by the defendants can be urged as a reason for holding that under the circumstances of the repudiated check, O'Leary for the com-

pany had not the right to determine for himself that the time had come for enforcing the letter of the contracts. If words mean anything, the contracts in question were not leases but licenses. They were severe and harsh in their terms as against the concessionaire undoubtedly, but they were voluntarily entered into and at the beginning seemingly coveted. We can not make contracts for people, nor relieve them from their own imprudence in taking undue risks. We think the bar concession, with which alone, for the purposes of this discussion we are concerned, was validly forfeited, leaving nothing to pass to the assignee in bankruptcy of Sbarbaro but his interest in his personal property located in the park, for which the defendants concede their obligation to account in law. If the right to have this forfeiture declared ineffectual does not exist, there is no equitable jurisdiction to be invoked in favor of complainant.

We might perhaps content ourselves, therefore, with stating the conclusion above given as to the validity of the forfeiture. It may not be amiss, however, to define our position also on the other basic propositions necessary to sustain a money decree in this case.

Even if the ''forfeiture'' had been invalid and the seizure of the premises unjustifiable, no property rights in the concessions would have passed to the assignee in bankruptcy, in our opinion. These concessions as before noted were contracts not conveyances, licenses not leases. They cannot be turned into real property or into chattels, real or personal, by the operation of the bankruptcy laws, or in order to furnish ground for equitable relief, nor because a part of the contract was the building by one party on the land of the other.

The Luna Park Company had a contract with Sbarbaro. If the forfeiture was void and invalid, then the Luna Park Company broke that contract on August 24, 1908, by unjustifiably revoking the privileges and permissions granted to Sbarbaro. For this Sbarbaro

had his personal actions for damages and when he went into bankruptcy on August 27th the beneficial right to that action and damages passed to the trustee. Such damages for breach of contract are properly to be ascertained by a jury. No equitable right to the "concessions" vested in the trustee. The authorities cited on the assignability of leases or certain classes of contracts by operation of law do not seem to us to be of force here. The concession contract was a personal one. It distinctly and expressly precluded by its terms assignability or transfer except by consent of the company. The trustee in bankruptcy could not assure his own or a vendee's satisfactory personality to the company. Whatever rights there were passing to the trustee either by way of an accounting for money, for goods used, or the seizure and constructive or actual conversion of chattels were legal, not equitable, rights, easily to be adjusted at law.

We think the whole theory of the bill and decree fallacious.

The decree is reversed and the cause remanded to the Superior Court, with directions to dismiss the bill for want of equity.

*Reversed with directions.*